**SO ORDERED.**

**SIGNED this 07 day of March, 2011.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GARY A. WOODS, | ) | Case No. 10-12397 |
| KAREN E. WOODS, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | |
| | ) | |

### MEMORANDUM OPINION

Secured creditor Hillcrest Bank, N.A. filed two motions in this case, one for stay relief and the other to dismiss.[1] The Court heard evidence on both motions on November 23, 2010, reviewed the exhibits and evidence presented then, together with the parties' stipulations,[2] and is now

---

[1] Dkt. 27 and 29.

[2] Dkt. 63.

-1-

prepared to rule.[3]

Factual Background

Debtors Gary and Karen Woods farm at Clearwater, Kansas. The Woods filed a previous chapter 11 case in this Court in 2002.[4] They confirmed a chapter 11 plan in that case that provided for Hillcrest's predecessor's secured claim to be allowed in the approximate amount of $1.4 million and approximately $62,000 allowed as an unsecured claim.[5] The debtors and Hillcrest stipulated that Hillcrest's secured claim would be treated first by the application of $250,000 stock sale proceeds.[6] The approximately $1.15 million remaining would be repaid annually over four years based upon a 20-year amortization at 6% interest with a balloon payment being due at the end of five years. This restructured obligation would continue to be secured by Hillcrest's pre-petition mortgages on real estate in Sedgwick County, Kansas and would be further secured by a new mortgage covering real estate in Butler County, Kansas. Once the Bank received the new mortgage, it would release its security interests in the debtors' crops, livestock, and equipment. The debtors filed a plan that incorporated this treatment that this Court confirmed on January 22, 2004.[7]

Under the terms of the confirmed plan, the amortization and payment periods were to begin

---

[3] Gary and Karen Woods appeared by J. Michael Morris. Mr. Woods was also present. Hillcrest Bank, N.A. appeared by Terry C. Cupps and by Ms. Sue Drakeford, a commercial loan officer with the Bank.

[4] Case No. 02-13368.

[5] Hillcrest Bank was placed in receivership by the Federal Deposit Insurance corporation on October 22, 2010 and the day after, its assets were acquired by Hillcrest Bank, N.A. For convenience, both entities will be referred to as "Hillcrest" or "Bank."

[6] Ex. 1. This stipulated treatment was entered and approved by the Court in May of 2003.

[7] Ex. 3.

-2-

Case 10-12397    Doc# 107    Filed 03/07/11    Page 2 of 11

one year after the effective date. The plan defined the effective date as the day the confirmation order became final and non-appealable. Under the version of Fed. R. Bankr. P. 8002(a) in effect at that time, the appeal period was 10 days long. The tenth day after January 22, 2004 was Sunday, February 1, 2004, making the effective date February 2, 2004. Therefore, the first four annual payments were due on February 2 of 2005, 2006, 2007, and 2008. The balloon payment was due on February 2, 2009. The unsecured obligation, which bore no interest, was also due and payable in full on February 2, 2009. In October of 2003, Hillcrest recorded the new mortgage on the Butler County land to further secure the restructured secured claim.[8]

In the meantime, the Woods pursued refinancing by contacting a bank in Parsons, Kansas in 2008. Gary Woods testified that he supplied that bank with financial statements and cash flow data, but the bank declined his application. He also testified that he inquired about selling some of his land during the five-year period. He made the four annual instalment payments as agreed, but defaulted on the balloon in February of 2009.

After the default, Woods gave Hillcrest a renewal note for each of the obligations.[9] These renewals matured on April 12, 2009. The large note bore interest at 6 per cent and the formerly non-interest obligation now bore interest at 4 per cent. He paid interest to Hillcrest monthly in March and April and, on April 12, executed an extension agreement with Hillcrest.[10] Under this agreement, the Bank allowed him until February 12, 2010 to refinance or sell-down his real estate holdings to reduce the principal. Woods was to continue to make monthly interest payments on both notes and,

---

[8] Ex. 4.

[9] Ex. 6 and 7.

[10] Ex. 8 and 9.

-3-

in addition, agreed to cross-collateralize both obligations with the both the Sedgwick and Butler County mortgages. The interest rate of both notes was increased to 7 per cent and Woods agreed to pay a one per cent "exit fee" at payoff.

Woods attempted to refinance his obligations with a bank in Conway Springs, Kansas, in August of 2009 but was again unsuccessful. When he was unable to pay in February, 2010, he began to list property for sale.[11] Woods made a monthly interest payment in March of 2010. He asked Hillcrest to extend his maturity until June to "give him the Spring" to find purchasers for some of the land and Hillcrest agreed. Woods was to execute an extension agreement that memorialized this agreement and pay the ad valorem taxes on the land. He did neither. Thereafter, the Bank called the notes and re-commenced the foreclosure sale that his earlier 2002 filing had stalled.[12] In addition, Hillcrest filed a new action in Butler County to foreclose the later mortgage.[13] On July 16, 2010, debtors filed this bankruptcy case, again forestalling the foreclosure cases.

Throughout 2009 and 2010, Woods' loan officer at Hillcrest was Sue Drakeford. Ms. Drakeford testified that her communications with him were almost entirely initiated by her and that Woods was oftentimes difficult to reach. Nonetheless, she indicated that the Bank had been willing to grant the extensions detailed above in the hope that Woods will be able to sell land or refinance his debt. The Bank did not expect Woods to sell all of his land or to pay off the note via land sales, but it did desire partial principal reduction. The Bank believed that its collateral value exceeded the

---

[11] Woods listed two 80-acre parcels at a listing price of $330,000. He received a couple of offers in the $210,000-$220,000 range in the January or February 2010 time frame but the land was not sold.

[12] Ex. 10. The sheriff's sale of the Sedgwick County land was set for July 21, 2010.

[13] Ex. 11.

-4-

debt by some $800,000. She also stated that Woods had paid as agreed on the extension agreements until he declined to sign the last one and failed to make the balloon payment.

Woods asserts that he could not refinance the Hillcrest debt because of the international credit crisis that began in the Fall of 2008. As noted, he sought alternative financing from two banks in 2008 and 2009, but was unsuccessful. He offered no evidence concerning the reasons for either bank declining his business. The only evidence Woods offered in support of his "crisis" theory was the opinion testimony of Robert Minter, Esq. Mr. Minter is a long-time Wichita lawyer and a well-respected member of the Bar of this Court. His practice is almost entirely focused on all phases of banking law. In addition, Minter has served and continues to serve on bank boards and on loan and audit committees. Woods offered Minter's expert testimony to support the idea that lending standards changed substantially from the time of the 2003 treatment stipulation made in Woods' first case to 2009, and that no one could have reasonably anticipated those changes. Minter testified that, based on his work for other bank clients, as of late 2008 and early 2009, bank regulators declared the existence of a "farm bubble" that undermined the value of farmland as collateral for asset-based loans. The regulators adopted policies that disfavored those kinds of loans. This was the only evidence that the Court allowed Mr. Minter to give. When debtors' counsel inquired as to Mr. Minter's expert opinion about whether Woods could have refinanced these loans in 2004 or whether he could have foreseen that refinancing would be unavailable in 2009, Hillcrest challenged his standing as an expert and whether his opinion met the standards of Fed. R. Evid. 702. The Bank asserted that Minter had never applied his knowledge and expertise to the set of facts before the Court so that even though he might be qualified, his testimony was not admissible. In addition, no written expert report was tendered to Hillcrest's counsel as required by Fed. R. Bankr. P. 7026 and

Fed. R. Civ. P. 26. This matter was tried on a Tuesday; Hillcrest's counsel learned the identity of the expert late afternoon of the preceding Friday. In answers served November 1, 2010 to previously-submitted interrogatories, the debtors identified no experts. In light of the failure to provide a report which the Court deemed prejudicial to the Bank, the Court excluded further expert testimony from Mr. Minter, without reaching whether his intended testimony met the standards of Rule 702.

Mr. Woods presented a proposed cash-flow document and indicated his desire to continue farming as well as his willingness to sell some of his land.[14] He has confirmed that willingness by asking the Court to allow his employment of an auctioneer and grant a § 363 motion to sell some of the land.[15] Nonetheless, Woods' cash flow suggests that he will only generate enough disposable income in 2011 to pay accruing interest on Hillcrest's obligation and that further operations without substantial sales will not materially reduce that obligation.

Analysis[16]

At issue today are Hillcrest's motions for stay relief and to dismiss the case. As grounds for both motions, Hillcrest alleges cause. Section 362(d) provides that stay relief may be granted for cause, including lack of adequate protection. Section 1112(b) provides that a case may be dismissed for cause. Woods did not pay his ad valorem taxes in 2010. Because unpaid property tax is a lien on the real estate in question and because that lien primes a pre-existing mortgage, the Bank's

---

[14] Ex. 19.

[15] In Dkt. 100, the Court granted a motion to sell one 80 acre tract. In Dkt. 89, the Court approved the debtors' employing Gene Francis as an auctioneer.

[16] The Court has jurisdiction of this core proceeding, 28 U.S.C. § 157(b)(1) and (b)(2)(A) and (G) and § 1334.

-6-

position has been impaired. Because Hillcrest appears to have a massive equity cushion and if adequate protection were the only issue, this problem could be easily remedied by an order conditioning the continuation of the stay on payment of taxes as they come due and servicing the interest on the past-due taxes going forward.

Unfortunately, adequate protection is not the only issue. Hillcrest argues on both motions that the present chapter 11 filing is a serial filing that is not made in good faith, but is an improper back-door modification of the debtors' 2004 confirmed plan that amounts to cause sufficient to lift the stay and dismiss the case. Debtors respond that their second chapter 11 filing is justified by the drying up of the credit markets which is a circumstance he could not have reasonably foreseen in 2004 when the initial plan was confirmed.

The Bankruptcy Code does not expressly prohibit the filing of serial chapter 11 cases. As the Supreme Court held in *Johnson v. Home State Bank*, had Congress intended to outlaw successive chapter 11 filings, it would have included that prohibition in § 109 where it explicitly conditioned or prohibited successive chapter 7 and 13 filings.[17] Still, many courts have held that a reorganized debtor may only file a subsequent case in certain circumstances. In *In re Adams*, a Kansas bankruptcy court considered this issue in the context of a second filing by a debtor whose rangeland was burned in a fire that consumed part of his cowherd after his first plan was consummated. In that case, the court stated:

> Courts agree that the general rule is that a reorganized debtor may not file a new plan to effect a modification of its substantially consummated plan. The terms of a confirmed plan are binding on the parties and should be given *res judicata* effect. The terms of a confirmed plan usually represent the results of negotiations between the debtor and its creditors, and the parties should be able to rely on the finality of

---

[17] 501 U.S. 78, 87, 111 S.Ct. 2150, 115 L.Ed. 2d 66 (1991).

-7-

Case 10-12397   Doc# 107   Filed 03/07/11   Page 7 of 11

those terms.[18]

Because § 1127 prohibits a reorganized debtor from modifying its plan once that plan has been substantially consummated, many courts conclude that permitting that debtor to accomplish the same end via a new filing would circumvent that section's clear prohibition.[19] Moreover, as these courts point out, permitting a debtor to make a serial filing allows it to evade binding responsibilities it incurred in proposing and confirming the previous plan. Because the creditors have acted in reliance on the earlier plan, it should not be subject to further modification.[20] Only where there has been a showing of "genuine need" for further reorganization that is established by an extraordinary change of circumstances that were unanticipated and not reasonably foreseeable at the time of the first plan, should a debtor be given a second opportunity to reorganize.[21] Even so, extraordinary circumstances will not support a new case where the changes do not substantially impair the debtor's performance under the confirmed plan.[22] In *Adams,* the burnt pasture and destroyed cattle met the extraordinary circumstances test and the court allowed the second filing to go forward.

---

[18] *In re Adams*, 218 B.R. 597, 600 (Bankr. D. Kan. 1998).

[19] As did Woods' counsel in argument, we note that BAPCPA amended § 1127 to add new subsection (e) allowing an individual to modify a confirmed plan at any time prior to the completion of payments under the plan whether or not substantial consummation has occurred. The Court doubts that this provision should be applied to modify a plan confirmed in a case filed before October 17, 2005, BAPCPA's effective date, and debtors do not rely on this provision for relief in any event.

[20] *Adams, supra* at 600-01.

[21] *Id.* at 601-02.

[22] *Id.* at 602.

Many courts have applied rules similar to those found in *Adams*.[23] Judge Norton's treatise notes that there are several other judicially-recognized "exceptions" to the case law ban on serial chapter 11 filings.[24] If the reorganized debtor proposes to liquidate in the later case, dismissal is not always indicated, although, as Norton notes, conversion to chapter 7 may well be in order. If the reorganized debtor is a "large debtor" with many employees, some courts permit a serial filing. In this case, the Woods are farmers who may not be subjected to liquidation in chapter 7 over their consent.[25] Nor are they "large debtors" with many employees.

The Court cannot conclude on this record that the Woods' inability to refinance in the Fall of 2008 and 2009 constitutes an "extraordinary change of circumstances." It may be that no one could have anticipated the precipitous economic decline that occurred in 2008, yet there is simply no evidence at all concerning why the banks in Parsons and Conway Springs turned Mr. Woods down. While the Court can generally conclude that asset-based loans are harder to get than they were, and that there may well be a farmland "bubble," that is not the same as demonstrating that the Woods could not refinance because of the bubble or because of changing loan standards. The best evidence of this would have been testimony or documentary evidence of what Woods' prospective bankers said or wrote to him on this subject.[26] Setting aside the "bubble" issue, the Woods knew from the summer of 2003 onward that they would have to refinance the Hillcrest obligation

---

[23] *See, e.g.*, *In re Tillotson,* 266 B.R. 565, 569 (Bankr. W.D.N.Y. 2001) (granting motion to dismiss serial filing unless debtor files plan that is "fundamentally fair" in 20 days).

[24] Hon. William L. Norton, Jr. and William L. Norton III, 6 NORTON BANKR. L. & PRAC. §111:4 (3d ed. Thomson/West 2008).

[25] *See* § 1112(c).

[26] The Court also notes that Woods did not offer into evidence the loan applications and supporting financials that he submitted to these prospective lenders.

Case 10-12397   Doc# 107   Filed 03/07/11   Page 9 of 11

sometime in the ensuing five to six years. The record reveals no effort made to do that until the end was very near. Any balloon loan bears with it the risk of inability to pay. Here, even after being given an additional year to repay, the Woods were still unable to complete a refinancing or sell enough ground to pay down their debt to satisfy Hillcrest.[27] While these circumstances are undoubtedly sad, inability to refinance is not the unforeseeable intervening cause that the range fire in the *Adams* case was.

The debtors also argue that the existence of "unusual circumstances" should prevent dismissal of this case in the best interest of the creditors under newly-added language in § 1112(b)(2). In order for a court to find such circumstances, however, some party in interest must establish that there is a reasonable likelihood of a plan's being confirmed within the § 1121(e) and 1129(e) time-frames or that the grounds for dismissal other than those in § 1112(b)(4)(A) are reasonably justified and may be cured in a reasonable time. Here, the "cause" relied upon by the Bank and found by the Court is the lack of extraordinary circumstances to warrant a second filing merely to recast the provisions of the first plan. It is true that there is substantial equity in the real property for the estate, but the debtors have not filed a plan and did not even really speculate at trial about what such a plan might say. Moreover, the Court observes that there are only seven claims filed in this case, six of which are amply secured by collateral. The claim of PHI Financial Services, filed in the amount of $33,173, is the only unsecured claim. While a complete liquidation of the debtors' assets might well provide PHI a dividend, such a liquidation does not appear to be what the debtors have in mind. In any event, PHI has taken no position in the matter.

---

[27] By the Court's rough calculation from debtors' Schedule A, they own some 1,000 acres of land, including their unencumbered and exempt homestead situated on approximately 95 acres and valued in excess of $500,000.

-10-

Finally, the strong prohibition on post-consummation modifications in § 1127(e) preserves an important finality principle in reorganizations. Creditors will be less likely to accept and rely on chapter 11 debt restructuring if they know that the deals can be undone any time the debtor's fortunes wane. Creditors deserve to be able to rely on confirmed plans, particularly when the plan is the result of negotiations and agreements between debtors and the creditor, as this plan was in 2003.[28] The Court therefore must conclude that cause exists for relief from the stay and dismissal of this case. Hillcrest's motions are GRANTED.

# # #

---

[28] Creditors of individuals filing chapter 11 cases after BAPCPA are on notice of the liberalized modification rules contained in § 1127(e) and presumably factor those rules into their decision-making. Hillcrest did not have that notice in 2003.

-11-